[Cite as *State v. Stanley*, 2016-Ohio-7284.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | ) | CASE NO. 14 MA 0106 |
| | ) | |
| PLAINTIFF-APPELLEE | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| LAVELLE A. STANLEY | ) | |
| | ) | |
| DEFENDANT-APPELLANT | ) | |

CHARACTER OF PROCEEDINGS:             Criminal Appeal from the Court of
                                      Common Pleas of Mahoning County,
                                      Ohio
                                      Case No. 13 CR 1229

JUDGMENT:                             Affirmed in part. Sentence Vacated.
                                      Remanded in part.

APPEARANCES:

For Plaintiff-Appellee:               Atty. Paul J. Gains
                                      Mahoning County Prosecutor
                                      Atty. Ralph M. Rivera
                                      Assistant Prosecuting Attorney
                                      21 West Boardman Street, 6th Floor
                                      Youngstown, Ohio 44503

For Defendant-Appellant:              Atty. Louis M. DeFabio
                                      4822 Market Street, Suite 220
                                      Youngstown, Ohio 44512

JUDGES:

Hon. Cheryl L. Waite
Hon. Mary DeGenaro
Hon. Carol Ann Robb

                                      Dated: October 5, 2016

WAITE, J.

{¶1} Appellant Lavelle A. Stanley appeals his July 11, 2014 Mahoning County Common Pleas Court convictions and sentencing for aggravated murder and attempted murder with specifications. Appellant argues that the trial court erroneously refused to instruct the jury on voluntary manslaughter. Additionally, Appellant argues that his convictions are against the sufficiency and the manifest weight of the evidence. Appellant also argues that the trial court failed to consider mitigating evidence when determining his sentence. For the reasons provided, Appellant's arguments are without merit and the judgment of the trial court is affirmed. However, we remand Appellant's sentence to the trial court with instructions to consider the consecutive sentencing factors.

Factual and Procedural History

{¶2} There are two victims in this case. The two were brothers. Derek Stewart ("Derek") was the older brother who had been living out-of-state while pursuing a semi-professional football career. The younger brother, Elliott Stewart ("Elliott") lived in Youngstown and operated with his mother the family business, Breeze Car Wax ("car wash"), and acted as business manager. Elliott was killed in the incident and Derek was shot. The incident occurred at the car wash, which is located at the corner of Southern Boulevard and Judson Street in Youngstown, Ohio.

{¶3} On November 15, 2013, the victims were both working at the car wash and were preparing to close for the night. The victims, along with several employees, heard people fighting outside the business. Both brothers went outside and

observed two girls arguing. Elliott ordered the girls to stop fighting. When the arguing did not stop, Elliott ordered everyone around the building to leave.

{¶4} Appellant was standing outside the building by his truck. After Elliott ordered everyone to leave, Appellant replied "who is you talking to? Don't be talking to me like that." (sic) (Tr. Vol. II, p. 244.) Elliott responded by asking Appellant if he wanted to fight. Appellant clutched his hip and replied "[n]ah. * * * I'm gonna heat your ass." (Tr. Vol. II, p. 247.) The expression is slang for "I'm going to shoot you." Elliott wrote down Appellant's license plate number and then left in his car.

{¶5} Derek attempted to diffuse the situation by talking to Appellant. He told Appellant that his brother's comments were not personal and were not directed at Appellant. Appellant got into his car and as he turned around in a driveway, shouted "y'all don't know who y'all messing with, man." (Tr. Vol. II, p. 251.) Derek approached Appellant's truck when it stopped at the stop sign across the street. Appellant rolled down his window and spoke with Derek. Appellant stated "I just got out of jail, you can't be talking to me like that, I'm not just anybody." (Tr. Vol. II, p. 278.) Derek again explained that his brother's comments were not directed at Appellant and that he was asking everyone to leave because of the argument between the girls. Appellant responded "my bad" and indicated that it was a misunderstanding. (Tr. Vol. II, p. 251.) Derek and Appellant's friends, who were nearby, repeatedly asked Appellant to leave.

{¶6} While the witnesses agree to the facts up to this point, witneses stories begin to diverge. According to several witnesses including Derek, Elliott returned in

his car and parked on the street. As Elliott got out of the car, he had a gun in his right hand. Before Elliott could get completely out of the car, Appellant fired five to nine shots. Three of the bullets struck Elliott, one bullet struck Derek, and at least one bullet struck Elliott's car. According to the witnesses, Appellant fired the shots as he drove his car around the corner and kept firing until his car disappeared. According to Appellant, Elliott got out of the car and pointed his gun at Appellant. Appellant testified that he reached for his gun and fired, as he feared that Elliott would shoot him. Appellant disputed witness testimony that he fired his gun as he drove off. Appellant claimed that he jumped when he saw Elliott's gun and his foot came off of the brake pedal and caused the car to coast.

{¶7} According to the coroner, Elliott suffered three gunshot wounds. The first wound was on his right shoulder and was non-lethal. A second shot struck him in the mouth. The third shot hit him in the left shoulder and traveled downward through his body and struck several major organs. The coroner testified that this injury was likely fatal. Derek was also shot, but he was released from the hospital after two days.

{¶8} Almost immediately after the shooting, the police began circulating wanted posters with Appellant's picture. Appellant concedes that he knew the police were searching for him, but explained that he planned to turn himself in after collecting money from family members to pay for an attorney. However, before Appellant turned himself in, the police located him. The police surrounded the house

he had been staying at and, after an hour, were able to get Appellant out of the house and arrest him.

**{¶9}** Appellant was charged with one count of aggravated murder, an unclassified felony in violation of R.C. 2903.01; one count of attempted murder, a felony of the first degree in violation of R.C. 2923.02; one count of felonious assault, a felony of the second degree in violation of R.C. 2903.11; and one count of having a weapon while under a disability, a felony of the third degree in violation of R.C. 2923.13. Both a three- and five-year firearm specification were attached to all counts except for the charge regarding possession of a weapon under a disability. Appellant waived his right to a jury trial on this charge.

**{¶10}** A jury trial on the aggravated murder, attempted murder, and felonious assault charges commenced on June 24, 2014. At trial, Appellant admitted he shot both Elliott and Derek, but claimed that he did so in self-defense. Before the jury instructions were read, both Appellant and the state discussed the instructions in chambers. Appellant initially requested only a self-defense instruction, which the state opposed, but later added a request for a voluntary manslaughter instruction. While the state believed that a voluntary manslaughter charge was more appropriate than a self-defense instruction, it argued that it would be inappropriate to give both instructions as they regard conflicting theories. The trial court agreed to instruct the jury on self-defense but declined to provide a voluntary manslaughter instruction, deciding that the facts did not support a voluntary manslaughter instruction and

would only serve to confuse the jury.  On June 24, 2014, the jury returned a verdict of guilty on all counts and specifications.

{¶11} On June 26, 2014, a sentencing hearing was held.  The state noted that Appellant could not be sentenced on both the firearm specifications and the charge of possessing a weapon under a disability.  Consequently, the disability charge was dismissed and the bench trial scheduled for that matter was cancelled.  The trial court instructed the state, as required, to choose between the attempted murder and felonious assault charges; the state elected to proceed on the former.

{¶12} Appellant was sentenced to life imprisonment without the possibility of parole on the murder conviction.  On the attempted murder charge, Appellant was sentenced to eleven years, to run consecutively with the sentence for aggravated murder.  Appellant was additionally sentenced on the firearm specifications.  The five-year specification for aggravated murder merged with the five-year specification for attempted murder.  The three-year specification for aggravated murder and the three-year specification for the attempted murder also merged.  However, the five- and three-year specifications did not merge and were ordered to run consecutive to one another and consecutively with the aggravated murder and attempted murder sentences.  This timely appeal followed.

First Assignment of Error

The Appellant's trial counsel properly requested that the trial court instruct the jury on the lesser-degree-offense of Voluntary Manslaughter as there was evidence of reasonably sufficient provocation adduced at

trial and, under any reasonable view of the evidence, it was possible for the jury to find the Appellant not guilty of Aggravated Murder or Murder but guilty of Voluntary Manslaughter. The trial court erred in refusing to charge the jury on the offense of Voluntary Manslaughter and, therefore, Appellant's convictions must be reversed.

**{¶13}** A "criminal defendant is entitled to have the trial court give complete and accurate jury instructions on all the issues raised by the evidence." *State v. Sneed,* 63 Ohio St.3d 3, 9, 584 N.E.2d 1160 (1992), citing *State v. Williford,* 49 Ohio St.3d 247, 251 N.E.2d 1279 (1990). Generally, "[w]hen reviewing a trial court's jury instructions, the proper standard of review whether the trial court's refusal to give a requested jury instruction constituted an abuse of discretion under the facts and circumstances of the case." *State v. Everson*, 7th Dist. No. 12 MA 128, 2016-Ohio-87, ¶ 58, citing *State v. DeMastry*, 155 Ohio App.3d 110, 2003-Ohio-5588, 799 N.E.2d 229 ¶ 72 (7th Dist.). An abuse of discretion can only be found if the court's attitude is unreasonable, arbitrary or unconscionable. *Id.,* citing *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). However, "[o]n appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." *State v. Wamsley*, 7th Dist. No. 05 CO 11, 2009-Ohio-1858, ¶ 26, citing Crim.R. 30.

**{¶14}** Appellant contends that the trial court erroneously refused to instruct the jury on voluntary manslaughter despite a request from both Appellant and the

state. Appellant asserts that a trial court must instruct the jury on voluntary manslaughter if the evidence at trial reasonably supports acquittal on a murder charge and conviction on a manslaughter charge. Appellant argues that the evidence here supported a finding of provocation, which would support both acquittal on the murder charge and conviction of a voluntary manslaughter charge.

{¶15} In support of his argument, Appellant highlights testimony showing that less than five minutes had elapsed from the start of the confrontation to the shooting. Appellant also cites testimony demonstrating that Elliott initiated the violence by suggesting that he wanted to fight Appellant. In what he describes as an "emotionally charged atmosphere," Appellant argues that Elliott's threats and the short period of time involved are evidence of provocation, sudden fit of passion, and lack of a cooling off period. (Appellant's Brf., p. 15.) Based on this evidence, Appellant explains that the jury could reasonably have rejected his self-defense argument but found that the shooting was the result of sufficient provocation and ensuing rage. Based on this argument, Appellant seeks a new trial.

{¶16} Noting that the trial court has discretion as to whether a jury instruction should be given, the state responds by arguing that a defendant is entitled to an instruction of a lesser-included offense only when sufficient evidence would allow a jury to reject the more serious offense and find the defendant guilty of the lesser-included offense. This test, according to the state, requires more than just "some evidence." (Appellee's Brf., p. 8.) The state argues that Appellant never testified that he acted under sudden passion or rage. Rather, he testified that he feared for his

life. The state argues that this testimony supports self-defense but not voluntary manslaughter. Regardless, the state argues that the theories of self-defense and manslaughter are incompatible and would only serve to confuse the jury.

**{¶17}** Although not raised by the parties, Appellant failed to object to the trial court's ruling regarding the voluntary manslaughter instruction. As such, Appellant is limited to a plain error review. A three-part test is employed to determine whether plain error exists. *State v. Parker*, 7th Dist. No. 13 MA 161, 2015-Ohio-4101, ¶ 25, citing *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). "First, there must be an error, *i.e.* a deviation from a legal rule. Second, the error must be plain. To be 'plain' within the meaning of Crim.R. 52(B), an error must be an 'obvious' defect in the trial proceedings. Third, the error must have affected 'substantial rights.' " *Parker* at ¶ 12, citing *State v. Billman*, 7th Dist. Nos. 12 MO 3, 12 MO 5, 2013-Ohio-5774, ¶ 21.

**{¶18}** The Ohio Supreme Court has stated that "the test for whether a judge should give a jury an instruction on voluntary manslaughter when a defendant is charged with murder is the same test to be applied as when an instruction on a lesser included offense is sought." *State v. Shane,* 63 Ohio St.3d 630, 632, 590 N.E.2d 272 (1992). "Thus, a defendant charged with murder is entitled to an instruction on voluntary manslaughter when the evidence presented at trial would reasonably support both an acquittal on the charged crime of murder and a conviction for voluntary manslaughter." *Id.* citing *State v. Tyler,* 50 Ohio St.3d 24, 37, 553 N.E.2d 576 (1990).

**{¶19}** The Court noted that:

Past decisions of this court have sometimes given the erroneous impression that, whenever there is "some evidence" that a defendant in a murder prosecution may have acted in such a way as to satisfy the requirements of the voluntary manslaughter statute, an instruction on the inferior-degree offense of voluntary manslaughter must be given.

*Id.* at 632.

**{¶20}** The Court clarified that:

The "some evidence" referred to in those cases is simply an abbreviated way of saying that a jury instruction must be given on a lesser included (or inferior-degree) offense when sufficient evidence is presented which would allow a jury to *reasonably* reject the greater offense and find the defendant guilty on a lesser included (or inferior-degree) offense. (Emphasis sic.)

*Id.* at 632-633.

**{¶21}** The elements for voluntary manslaughter are found within R.C. 2903.03(A), which states that: "[n]o person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another."

**{¶22}** While the state correctly points out that an instruction on voluntary manslaughter is generally incompatible with and contradictory to self-defense, there

is no blanket rule holding the two theories inconsistent or contradictory. *State v. Williams,* 7th Dist. No. 11 JE 7, 2012-Ohio-5256, ¶ 24. See also *State v. Perdue,* 153 Ohio App.3d 213, 2003-Ohio-3481, 792 N.E.2d 747 (7th Dist.) (Waite, J., dissenting) (disagreeing with the majority's reversal of the judgment of the trial court based on the belief that the record contained sufficient evidence to support the elements of voluntary manslaughter). Thus, the issue here is whether Appellant presented sufficient evidence at trial to support the elements of voluntary manslaughter.

{¶23} As earlier discussed, in order to be entitled to a voluntary manslaughter instruction, Appellant was required to establish that sufficient evidence was presented to show that he acted under the influence of sudden passion or a fit of rage and that passion or rage was brought on by sufficient provocation. This record is devoid of any evidence which would show that Appellant acted pursuant to a sudden passion and sufficient provocation. At trial, Appellant testified that after Elliott left in his car, he and Derek explained their point of view and then "everything was cool."

{¶24} "A lapse of time, i.e., a cooling off period, between the circumstances causing the defendant to be enraged and the commission of the crime renders the 'sudden passion' element of voluntary manslaughter insufficient as a matter of law." *State v. Shakoor,* 7th Dist. No. 01 CA 121, 2003-Ohio-5140, ¶103. In Ohio, caselaw has held that a cooling off period can occur within a short period of time. See *State v. Townsend,* 7th Dist. No. 04 MA 110, 2005-Ohio-6945 (the time it takes for a

person to drive home and retrieve a weapon constitutes a sufficient cooling off period); *State v. Byerly,* 5th Dist. No. 02-C81, 2003-Ohio-7911 (the time it takes for a person to walk one-half mile home is enough for a cooling off period); *Shakoor, supra* (the time it takes a person to reload or readjust a weapon is a sufficient cooling off period).

**{¶25}** Here, in addition to Appellant's admission that "everything was cool" after Elliott drove off, there is evidence that sufficient time passed to constitute a cooling off period. According to the record, Elliott left in his car and returned approximately 3-5 minutes later. According to Ohio law, the time it took for Elliott to leave in his car, apparently obtain his gun, and then return to the business was a sufficient cooling off period. Consequently, in order to find provocation, here, Appellant would have to show that some further exchange occurred after Elliott returned. Although Appellant argues that Elliott's return with a gun qualifies as such an exchange, it does not. At best, it may provide evidence of self-defense.

**{¶26}** A sudden passion or fit of rage that rises to the requisite level of voluntary manslaughter is "akin to anger, hatred, jealousy, and/or furious resentment." *State v. Harris,* 129 Ohio App.3d 527, 535, 718 N.E.2d 488 (10th Dist.1998), citing *Black's Law Dictionary* (6th Ed.1990). Appellant argues that the evidence shows that he acted pursuant to a sudden fit of rage due to the emotions caused by the incident.

**{¶27}** However, Appellant's testimony was that he shot the victims out of fear, not anger. At trial, Appellant claimed that he drew his weapon because he feared for

his life. He testified that he fired his weapon based on that same fear. "Q [The State] You intentionally did this, right? A [Appellant] Because I feared for my life." (Tr. Vol. III, p. 580.) When asked what went through his head as Elliott allegedly raised the gun, Appellant said "[t]hat he was going to try to kill me and that was my only way out. I fired." (Tr. Vol. III., p. 549.)

{¶28} Several Ohio Courts have addressed similar arguments. In one case, the defendant approached the victim, who was selling drugs in front of the defendant's grandmother's house, and asked him to move down the street. *State v. Thomas,* 9th Dist. No. 27266, 2015-Ohio-2935, ¶ 2. The victim responded by threatening to fight the defendant. The defendant accepted the fight and, at one point, the defendant attempted to punch the victim but missed. The victim then pulled out a gun which the defendant knocked to the ground. The defendant gained control over the gun and shot the victim. At trial, the defendant explained that he fired the gun out of fear that the victim would take the gun from him and kill him. *Id.* at ¶ 25. He requested both a self-defense and voluntary manslaughter instruction. The court agreed to provide a self-defense instruction but declined to provide a voluntary manslaughter instruction based on the defendant's testimony that he shot out of fear, not because of provocation from the fight. *Id.* at ¶ 25. Thus, the Court held that the evidence supported a self-defense instruction but not voluntary manslaughter.

{¶29} In another case, the victim allegedly threatened the defendant with a baseball bat. *State v. Platt,* 9th Dist. No. 18835, 1998 WL 887220, *1 (Dec. 16,

1998). At trial, the defendant testified that he shot the victim because he feared for his life. *Id.* at 2. The trial court rejected the defendant's request for a voluntary manslaughter instruction based on his testimony that he shot the victim out of fear rather than anger or passion. The Ninth District affirmed the trial court's ruling and held that the testimony produced at trial was only relevant to self-defense.

**{¶30}** In a third case, the defendant testified that he and the victim argued and the victim reached for his gun. *State v. Perry,* 11th Dist. No. 94-T-5165, 1997 WL 590789, *2 (Aug 19, 1998). The defendant testified that he attacked and beat the victim to death because he was afraid that she would shoot him. The defendant requested a voluntary manslaughter instruction, which the trial court denied. The Eleventh District upheld the trial court's decision after finding that the defendant's testimony suggested self-defense, not voluntary manslaughter.

**{¶31}** This Court has previously acknowledged that "[f]ear is insufficient to demonstrate the emotional states of sudden passion or a fit of rage, and these latter emotional states are essential elements of the definition of voluntary manslaughter." *State v. Williams,* 7th Dist. No. 11 JE 7, 2012-Ohio-5256, ¶ 24.

**{¶32}** Appellant testified that he shot the victim because he feared that the victim would shoot and kill him. Consistent with the above-cited caselaw and based on Appellant's testimony, he failed to establish that the evidence showed he acted pursuant to an emotional state of sudden passion or fit of rage. Instead, his testimony reflects self-defense. As such, the trial court correctly determined that

Appellant was not entitled to a voluntary manslaughter instruction. Appellant's first assignment of error is without merit and is overruled.

Second Assignment of Error

The jury's verdict of Guilty as to the Aggravated Murder charge was not supported by sufficient evidence and was against the manifest weight of the evidence.

{¶33} Appellant raises both manifest weight and sufficiency of the evidence arguments within his second assignment. Specifically, Appellant contests the jury's finding that he acted with "prior calculation and design." Appellant argues that instantaneous deliberation, alone, is insufficient to support a finding of prior calculation and design. As such, Appellant reasserts his previous argument that the evidence supports a finding of voluntary manslaughter, not murder. Appellant further contends that the jury's decision was based on emotions rather than the facts, because of the state's portrayal of Appellant as a violent thug and the victim as a good and decent person.

{¶34} In response, the state points to Appellant's admission that he clutched his hip to indicate that he had a gun during the incident, which escalated the situation. The state also cites to testimony that Appellant made several threats during the encounter. In addition to the threats, the state urges that Appellant continued to fire his gun as he drove away. According to witness testimony, the victim never pointed his gun at Appellant. In fact, the state argues that the evidence shows that Elliott was shot before he was able to fully exit his car. Based on this

evidence, the state contends that there was sufficient evidence to support a finding of prior calculation and design.

**{¶35}** In relevant part, Crim.R. 29(A) states that "[t]he court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses."

**{¶36}** "Sufficiency is a term of art meaning that legal standard which is applied to determine whether a case may go to the jury or whether evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Draper*, 7th Dist. No. 07 JE 45, 2009-Ohio-1023, ¶ 14, citing *State v. Robinson*, 162 Ohio St. 486, 124 N.E.2d 148 (1955). A reviewing court does not determine "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Rucci*, 7th Dist. No. 13 MA 34, 2015-Ohio-1882, ¶ 14, citing *State v. Merritt*, 7th Dist. No. 09-JE-26, 2011-Ohio-1468, ¶ 34.

**{¶37}** In contrast, Article IV, Section 3(B)(3) of the Ohio Constitution authorizes appellate courts to assess the weight of the evidence. *Draper, supra,* at ¶ 25. When a manifest weight argument has been presented, "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the

conviction must be reversed and a new trial ordered." *Id.* at ¶ 26, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶38}** Unlike sufficiency, where we determine on review whether some evidence was presented on all elements of the crime, a manifest weight of the evidence review determines whether the evidence is persuasive or believable. *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis deleted.) *Eastley v. Volkman,* 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12, citing *Thompkins, supra,* at 387, 678 N.E.2d 541.

**{¶39}** If a court of appeals disagrees with a jury's decision and reverses a verdict, the court acts as a thirteenth juror. *Id.* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Accordingly, an appellate court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Draper, supra,* at ¶ 29. In order to reverse a jury verdict under manifest weight of the evidence, three appellate judges must concur. *Id.*, citing *Thompkins* at 389.

**{¶40}** The elements for aggravated murder are found within R.C. 2903.01(A), which states that "[n]o person shall purposely, and with prior calculation and design, cause the death of another." Here, Appellant disputes the jury's finding that he acted with prior calculation and design.

**{¶41}** Several witnesses testified about the events that led up to the shooting. The first witness to testify was Derek. Derek testified that his brother ordered

bystanders outside the building to leave after the girls began to argue. He testified that Appellant responded by yelling "[w]ho is you talking to? Don't be talking to me like that." (Tr. Vol. II, p. 246.) His brother then asked Appellant if he wanted to fight and began to take off his jacket. Appellant responded by stating "[n]ah. * * * I'm gonna heat your ass" as he reached for his hip. (Tr. Vol. II, p. 247.) According to Derek, the expression is slang for "I'm going to shoot you." Shortly thereafter, Elliott typed Appellant's license plate number into his phone, took his car keys, and left.

**{¶42}** Derek explained that he attempted to diffuse the situation by talking to Appellant. Despite his efforts, Derek testified that Appellant got into his car and stated "[y]'all don't know who y'all messing with, man." (Tr. Vol. II, p. 251.) Appellant then turned around in a driveway and stopped at a stop sign just across the street. Derek approached Appellant's truck and explained that his brother's comments were directed at the girls who were arguing, not him. Appellant indicated that it was a misunderstanding and responded "my bad." Derek testified that he and several of Appellant's friends repeatedly urged Appellant to leave. According to Derek, Elliott then drove up. A gun was visible in his right hand as he attempted to exit his car. Appellant fired his gun in Elliott's direction before he could completely exit the car.

**{¶43}** Two employees of the car wash and a third witness, who was the teenage son of one of the witnesses, confirmed Derek's testimony. One witness additionally testified that when Appellant "was shooting, he started driving away and turned the corner and was still shooting." (Tr. Vol. III, p. 308.)

**{¶44}** Officer Mark Gillette of the Youngstown Police Department FBI Violent Crimes Task Force testified about Appellant's arrest. According to Officer Gillette, the police posted wanted posters around the area seeking Appellant. He first made contact with Appellant on December 2, 2013, and Appellant told him that he would turn himself in once he obtained money to hire an attorney. On December 16, 2013, Officer Gillette and several other officers located Appellant at a house and surrounded the building. After one hour, the officers were able to coax Appellant out of the house and arrest him.

**{¶45}** Dr. Joseph Ohr, the coroner, testified that the fatal bullet entered through Elliott's shoulder and traveled downward through his body. Although Dr. Ohr could not testify with certainty that the downward path of the bullet confirmed witness testimony that Elliott was still in the process of getting out of his car when he was shot, Dr. Ohr stated that it was a possibility.

**{¶46}** The final relevant witness was Appellant. Appellant agreed with the witnesses' testimony up to the point that Elliott left in his car. According to Appellant, after Elliott left, Appellant saw his uncle pull up in his new car. A person unrelated to the incident took the car for a drive and Appellant testified that he waited with his uncle until the car was returned. Once the car was returned, Appellant said that he got into his truck, turned around in a driveway and pulled behind his uncle's car at the stop sign. According to Appellant, Derek approached his car and after the two men spoke, "everything was cool." Shortly thereafter, he saw Elliott's car speeding around the corner.

**{¶47}** Appellant testified that Elliott drove past him and parked on the other side of the street. He noticed that Derek looked over his shoulder in the direction of Elliott's parked car. This prompted Appellant to lean out of the window and look at Elliott's car. Appellant saw Elliott point a gun at him. Fearing that Elliott was going to shoot and kill him, Appellant testified that he reached for his gun, which was at his hip, and fired approximately five times in the general direction of Elliott. He explained that right before he fired his foot came off of the brake pedal and the car coasted a bit until he was able to get his gun and gain control over the car, then he fired his weapon, ducked, and drove off.

**{¶48}** During his testimony, Appellant agreed that the outcome of the case turned on whether the jury accepted his version of the facts or the witnesses' version. Based on the cumulative evidence presented by the witnesses, there is ample evidence to support the jury's finding that Appellant acted with prior calculation and design. Importantly, each of the witnesses, except for Appellant, testified that Elliott had not fully exited his car and had not raised his weapon when Appellant fired his gun. Additionally, although the coroner could not testify with certainty that the downward direction the bullet traveled conclusively meant that Elliott was in the process of exiting the car when he was shot, it was possible. This suggests that Elliott was shot before he posed a threat. Thus, a jury could reasonably conclude that Appellant did not fire his gun out of self-defense but shot the victim purposefully.

**{¶49}** Appellant also conceded that he made several threats to the victim, including reaching for the gun at his hip while the two men argued. There was

testimony that Appellant waited at the business for Elliott to return despite being urged to leave several times by both his friends and Derek. Although Appellant claims that he was waiting for his uncle's car to return, his uncle did not testify and no other witness corroborated this testimony.

{¶50} Appellant testified that he saw Elliott raise his gun and that Appellant then reached for his gun, which was at his hip. Appellant explained that Elliott was behind him, so he had to reach and lean out of his window to fire at him. As the state pointed out, Appellant was in his car. Instead of simply speeding away from the scene, Appellant took the time to reach for his gun and lean out of his car window and fire his gun. It is important to note that Elliott did not at any time fire a gun during the incident and each witness testified that Elliott never raised his gun. Finally, there is witness testimony that Appellant fired his gun as he drove around the corner and continued to fire until he disappeared.

{¶51} As Appellant's version of the events leading up to the shooting admittedly conflicted with the testimony of all four witnesses, the issue is one of credibility. It is apparent from the jury's verdict that it found the witnesses to be more credible than Appellant. The witnesses' facts were consistent and tended to corroborate each other's testimony. There is nothing within the record to discredit any of the witnesses. As such, the jury's finding is not against either the sufficiency or the weight of the evidence. Accordingly, Appellant's second assignment of error is without merit and is overruled.

<u>Third Assignment of Error</u>

The trial court erred and abused its discretion in failing to consider statutory sentencing criteria and by sentencing Appellant to a term of imprisonment of life without parole eligibility.

**{¶52}** Appellant contends that the trial court failed to consider mitigating evidence that he acted under strong provocation when determining his sentence. Appellant notes that while life imprisonment was mandatory, the trial court had discretion as to whether he would be eligible for parole. Despite the trial court's acknowledgment that "there was testimony that justified [a self-defense] instruction," he was sentenced to life imprisonment without the possibility of parole simply because a death occurred. (Appellee's Brf., p. 33.) Appellant urges that death is an element of aggravated murder and cannot be used as a basis for sentencing to the maximum penalty.

**{¶53}** In response, the state argues that the record demonstrates the trial court considered the appropriate sentencing statutes in determining Appellant's sentence. The state notes that Appellant's sentence is within the permissible statutory range. As such, the state argues that a sentence of life imprisonment without the possibility of parole was proper.

**{¶54}** An appellate court is permitted to review a felony sentence to determine if it is contrary to law. *State v. Marcum,* Slip Opinion No. 2016-Ohio-1002, ¶ 23. Further, "an appellate court may vacate or modify any sentence that is not clearly and convincingly contrary to law only if the appellate court finds by clear and convincing evidence that the record does not support the sentence." *Id.* at ¶ 23. Here, Appellant

does not argue that his sentence, which is within the sentencing guidelines, is contrary to the law. Thus, in order to sustain his argument, this Court must clearly and convincingly find that the record does not support the sentence.

{¶55} Appellant contends that the trial court failed to consider evidence that Elliott provoked him into the shooting. However, as discussed earlier, this record does not support a finding of provocation. Even so, the Ohio Supreme Court has held that "provocation deserves very little weight as a mitigating factor." *State v. Hutton*, 100 Ohio St.3d 176, 189, 2003-Ohio-5607, 797 N.E.2d 948, ¶ 82. In *Hutton*, which is factually similar to the matter before us, the Court reasoned that the defendant had committed murder with prior calculation and design and the defendant had sufficient time to cool off before committing the murder. *Id.* This record supports a similar conclusion. Appellant has failed to present clear and convincing evidence to demonstrate that the record does not support his sentence. Accordingly, Appellant's argument is without merit and is overruled.

{¶56} Although not raised by the parties, this record is devoid, however, of evidence that the trial court considered R.C. 2929.14(C) (4) factors when it sentenced Appellant to consecutive prison terms. Pursuant to R.C. 2929.14(C)(4), before a trial court can impose consecutive sentences on a defendant, the court must find:

[T]hat the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct

and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

**{¶57}** A trial court judge must make the consecutive sentence findings at the sentencing hearing and must additionally incorporate the findings into the sentencing entry. *State v. Williams*, 7th Dist. No. 13 MA 125, 2015-Ohio-4100, 43 N.E.3d 797, 806, ¶ 33-34, citing *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 37. The court need not state reasons to support its finding nor is it required to use any "magic" or "talismanic" words, so long as it is apparent that the court

conducted the proper analysis. *Id.* citing *State v. Jones*, 7th Dist. No. 13 MA 101, 2014-Ohio-2248, ¶ 6; *State v. Verity*, 7th Dist. No. 12 MA 139, 2013-Ohio-1158, ¶ 28-29.

**{¶58}** At Appellant's sentencing hearing, the trial court judge stated:

So I have to recite that consecutive terms are imposed because the harm is so great and so unusual that a single term does not adequately reflect the seriousness of the offender's conduct and that the offender's criminal history shows that consecutive terms are necessary to protect the public.

* * *

I also believe from the pronouncements of our Court of Appeals and the legislature that I have to advise you that if you're ever released from the penitentiary, you're required to serve a mandatory term of five years of post-release control, subject to the rules of the Adult Parole Authority and all laws.

Please understand that I'm only doing this advice because I think I have to, but my intention is that you never get out of the penitentiary.

(Sentencing Hrg., pp. 24-25.)

**{¶59}** This statement represents the sole analysis conducted by the trial court. It is clear from this statement that the trial court not only failed to conduct the proper R.C. 2929.14(C) analysis but blatantly stated its goal was to insure that Appellant

remain incarcerated for life, without regard to the requirements of the law. Such a pronouncement was improper and cannot serve as a substitute for the strictures of R.C. 2929.14(C).

**{¶60}** The Ohio Supreme Court has held that "[a]ny attempt by a court to disregard statutory requirements when imposing a sentence renders the attempted sentence a nullity or void". *State v. Beasley*, 14 Ohio St.3d 74, 75, 471 N.E.2d 774, 775 (1984). If a court disregards such requirements, "the trial court will re-sentence appellant 'as if no prior attempt to sentence had been made.' " *State v. Smith*, 10th Dist. No. 04AP-859, 2005-Ohio-2560, ¶ 60, citing *State v. Washington*, 10th Dist. No. 00AP–1077, 2001 WL 818137 (July 17, 2001); *State v. Thomas*, 80 Ohio App.3d 452, 458, 609 N.E.2d 601 (3d Dist.1992).

**{¶61}** Accordingly, we remand with instructions to resentence Appellant based on a proper consideration of the law.

## Conclusion

**{¶62}** Appellant argues that the trial court improperly refused to instruct the jury on voluntary manslaughter. This record supports the trial court's decision as there is no evidence to support the elements of voluntary manslaughter. Appellant also argues that his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. However, the record appears replete with competent, credible witness testimony to support the jury's verdict. Finally, Appellant argues that the trial court failed to consider mitigating evidence when determining his sentence. As the record is devoid of any evidence that the victim

provoked Appellant, the trial court did not err in sentencing Appellant to life imprisonment and his convictions are affirmed. However, because the record shows that the trial court failed to consider the R.C. 2929.14(C) factors when it sentenced Appellant to consecutive prison terms, his sentence is hereby vacated in part and this matter is hereby remanded to the trial court for limited resentencing according to law and consistent with this Court's Opinion.

DeGenaro, J., concurs.

Robb, J., concurs.